UNITED STATES *v.* F. S. WHELAN & SONS

No. 7995.— <span style="background:black">▮▮▮▮▮▮▮▮</span>

Entry No. 1496.

## Second Division, Appellate Term

(Decided May 10, 1951)

*David N. Edelstein,* Assistant Attorney General (*Daniel I. Auster,* special attorney), for the appellant.

*Kirkland, Fleming, Green, Martin & Ellis* (*Hammond E. Chaffetz, Chauncey P. Carter, Jr.,* and *E. Ladd Thurston, Jr.,* of counsel) for the appellee.

Before Lawrence, Rao, and Ford, Judges

Rao, Judge: This is an application for review of a determination of the trial court that foreign value, as that value is defined in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. § 1402 (c), as amended), is the proper basis of value for an importation of birch plywood, and that such value, for each item of plywood imported, is the entered value.

The merchandise in question which was imported from Canada, in carload lots, consisted of birch plywood of various grades, sizes, and thicknesses. Entry of each of the different items included in the shipment was made at a price per thousand square feet which was equivalent to that at which such or similar merchandise was sold by the manufacturer in the foreign market in carload quantities.

The merchandise was appraised at a value which represented the price the exporter received for sales in Canada of such or similar merchandise in less than carload lots, under 5,000 square feet. The advance of the appraised value over the entered value was approximately 20 per centum.

Counsel for the respective parties hereto have agreed that foreign value, as that value is defined in section 402 (c) of the Tariff Act of

1930, as amended, is the proper basis of value for said merchandise, and that there is no higher export value. The provision in question reads as follows:

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

It was further agreed that if the court should find the usual wholesale quantity to be less than carload lots, under 5,000 square feet, then the appraised value should be affirmed as the proper foreign value, but that if the usual wholesale quantity is found to be carload lots, the entered value represents foreign value.

Montreal, Canada, was conceded to be the principal market in Canada for this merchandise at the time of exportation.

It is at once apparent from the foregoing stipulation that the only question involved in this case is "What were the 'usual wholesale quantities' in which this merchandise was freely offered for sale in Canada for home consumption?"

The facts supplied by the parties to enable us to reach a conclusion upon this question are not seriously controverted. They are to be derived entirely from documentary evidence which has been incorporated in the record. These reveal that International Plywoods, Ltd., the exporter of the instant merchandise, is engaged in the business of manufacturing birch plywood which it offers for sale, and sells both in Canada and in the United States. At or about the time of exportation of the particular shipment here involved, International Plywoods, Ltd., freely offered for sale and sold said merchandise for domestic consumption at three different price scales, depending upon the quantity of birch plywood purchased. Irrespective of the grade, size, or thickness ordered, and notwithstanding whether the purchaser was a so-called distributor, dealer, or consumer, the lowest price per thousand feet was charged to all who bought the merchandise in carload quantities. Prices substantially 15 per centum higher were charged for orders of more than 5,000 square feet, but less than carload lots; while those who purchased less than carload quantities, and under 5,000 square feet, paid approximately 20 per centum more per item than purchasers of carload quantities.

Although it was affirmed by the general manager of the exporter, in his affidavit, which was received in evidence as plaintiff's exhibit 1, that the company devoted itself to sales in carload lots, as being the most efficient and least costly method of distribution, owing particularly to the fact that all of said company's facilities were designed for carload

lot sales, less than carload lots being described as "incidental sales in the ordinary course of business," other evidence of record conclusively establishes that sales in each of the aforementioned quantity brackets were wholesale sales, and that it was the regular course of the company's business to make such sales.

For example, the Government offered in evidence as sub-exhibits 8, 9, and 10 of defendant's collective exhibit 3, copies of authorized price lists issued by International Plywoods, Ltd., effective as of June 14, 1947, and July 6, 1947, showing prices of the various grades and thicknesses when purchased in carload lots, in less than carload lots, minimum quantity 5,000 square feet, and in less than carload lots under 5,000 square feet. No qualifications or restrictions accompany any of the prices quoted for the various items included in the sub-exhibits. Nor is there any indication that the offers of less than carload quantities constituted an unusual, sporadic, or incidental method of distribution of the company's products.

There is also in evidence (plaintiff's exhibit 2) a tabulation of all sales for home consumption made by the manufacturer during a 3-month period in 1947, which, though subsequent to the date of exportation, has been agreed upon as accurately typifying the exporter's sales practices as of the date of exportation. This exhibit lists 268 sales made during the period selected. Of these 59 were in carload lot quantities, 39 in less than carload lots, over 5,000 square feet, and 170 in less than carload lots, under 5,000 square feet. According to the dates of shipments of the various orders included in the exhibits, it is evident that sales in less than carload quantities were an almost daily occurrence.

If we are to accept as established law the proposition that usual wholesale quantities are to be determined by a consideration of the major portion of sales in wholesale quantities, no evidence other than that which has already been detailed need be considered, for it clearly and conclusively appears that the major portion of this company's sales was in wholesale quantities of less than carload lots, under 5,000 feet. In view, however, of the rationale of the decision of the trial court, we deem it pertinent to recite certain other facts adduced at the trial. These relate particularly to the volume of business conducted by the exporter in each of the three quantity categories. Both with respect to the total footage sold, and the invoice value of such sales, the overwhelming proportion of the company's business resulted from sales in carload quantities. The recapitulation of sales which constitutes the first page of exhibit 2 contains the following summary of sales in Canada:

| CANADIAN SALES: | No. of sales | Actual footage | Percentage to total | ¼" Converted footage | Percentage to total | Invoice value | Percentage to total |
|---|---|---|---|---|---|---|---|
| Carload | 59 | 2,946,255 | 90.33% | 3,601,578 | 90.59% | $425,347.26 | 89.15% |
| Less Carload over 5M Sq. Ft. | 39 | 148,048 | 4.54% | 181,568 | 4.57% | 23,859.21 | 5.00% |
| " " under 5M Sq. Ft. | 170 | 167,180 | 5.13% | 192,350 | 4.84% | 27,904.05 | 5.85% |
| | 268 | 3,261,483 | 100 % | 3,975,496 | 100 % | $477,110.52 | 100 % |

This very great percentage of business, with respect to volume as distinct from numerical preponderance of sales, in carload lot quantities, it seems to us, was the prime motivating factor which impelled the trial court to conclude that the carload quantity price of each item of the imported merchandise was the proper foreign value. Thus in the trial court's opinion we find:

This construction of the term "the usual wholesale quantities" used in the valuation sections of the tariff act by invoking the so-called "major portion of sales" rule is wholly in conflict with commercial realities, trade and business practices, and the facts and conditions of business and commerce in both foreign and domestic markets.

It is beyond question, in respect to both foreign and domestic trade and commerce, that for most transactions the basic unit price of goods is related, directly or indirectly, to the quantity purchased. Cf. R. Elberton Smith, *Customs Valuation in the United States* (Chicago, 1948), p. 169, and concurring opinion by Bland, J., in *United States* v. *M. Minkus*, 21 C. C. P. A. 382, at p. 390. The major portion of sales rule gives controlling importance to the greatest number of sales, which may be and often is wholly disproportionate to the volume and type of business done in a given commodity or item of goods, and which, experience has shown, does not necessarily present a true picture of the value situation in the actual market for the goods.

\* \* \* \* \* \* \*

In the appraisement of merchandise for tariff purposes various aspects of the goods, tangible and intangible, are elements for consideration in arriving at the value thereof. There is no reason why, in cases where the value or price of such or similar goods in the foreign market depends upon the quantity purchased, the quantity imported should be disregarded in determining the value thereof.

In order for the trial court to have arrived at these conclusions, it was, of course, necessary for it to have repudiated *in toto* the major portion of sales rule for determining usual wholesale quantities. As we view it, that rule has been so frequently pronounced and reiterated by our appellate court, that it has become a basic precept from which it is not our province to deviate, however compelling the circumstances to the contrary may be.

The genesis of the principle itself may be found in the case of *G. W. Pleissner* v. *United States*, 16 Ct. Cust. Appls. 507, T. D. 43237, where, as here, the court was concerned solely with finding "usual wholesale quantities," within the meaning of that phrase as it appeared in the foreign value provision, section 402 (b) of the Tariff Act of 1922. The court, after quoting the dictionary definitions of "ordinary" and "usual," stated:

It seems quite obvious that the usual wholesale quantities, as used in this statute, should be held to refer to a major portion of the sales or offers for sale of the merchandise in question, and that sporadic sales or sales in minor quantities should not be held to constitute *usual* wholesale quantities. This being true, the record should be examined in order to disclose whether there is any substantial evidence therein to support the finding that less quantities than 100 meters of this cloth are usual wholesale quantities. [Italics quoted.]

Evidence produced by a customs representative of sales in the country of exportation of the merchandise in lengths less than 100 meters was rejected because it did not show "the volume of such sales * * *, as compared with the gross sales of the product."

Whether the court was speaking of the "volume of sales" in terms of numbers of individual sales rather than in terms of total value is not entirely free from doubt. However, in view of the first-quoted expression from the court's opinion, it may reasonably be assumed that it meant the former rather than the latter. In any event, it found no evidence to contradict that of the witnesses for appellant that 100 meters was a usual wholesale quantity, and it so held.

Subsequently, the rule was more definitely expressed in the case of *United States* v. *M. Minkus*, 21 C. C. P. A. (Customs) 382, T. D. 46912. There, the merchandise at issue consisted of miniature dictionaries which were sold by the manufacturer and exporter at a basic list price, less varying discounts, depending upon the quantity purchased. According to the statement of the foreign manufacturer, the bulk of his merchandise was sold at a price of 1 mark, less 75 per centum discount, which represented the entered value. The court made the following comment concerning that testimony:

* * * From this statement, we think it is apparent that he meant that the major portion of their dictionaries were sold at a price of one German mark, less a discount of 75 per centum. This is not the equivalent of saying that the "major portion of the sales or offers for sale" were at the basic price of one German mark, less a discount of 75 per centum, nor have we been able to find any evidence of record to that effect.

For all that appears of record, the major portion of the manufacturer's dictionaries may have been sold to three or four purchasers, in wholesale quantities of 10,000 or more, at the basic price of one German mark, less a discount of 75 per centum; whereas, the rest of its dictionaries may have been sold in wholesale quantities to hundreds of buyers, at the basic price of one German mark, less discounts varying from 33⅓ per centum to 70 per centum, depending upon the quantities purchased.

It then proceeded to hold:

* * * that the language "in the usual wholesale quantities" was intended "to refer to a major portion of the sales or offers for sale," in wholesale quantities, of imported merchandise, subject, however, to the further limitation hereinbefore indicated that, although the word "quantities" must be applied in the plural, in the sense hereinbefore stated, the statute does not contemplate two or more "usual wholesale quantities" having two or more market values or prices. On the contrary, the statute does contemplate, we think, but one—*the usual*—having but one "market value" or "price * * * at which such or similar merchandise is freely offered for sale to all purchasers," at the time of exportation to the United States.

When the case of *Jenkins Brothers* v. *United States*, 25 C. C. P. A. (Customs) 90, T. D. 49093, was before the Court of Customs and Patent Appeals for decision, there was no longer any question but that

it considered as the sole determinant of usual wholesale quantities, the major portion of sales or offers for sale in wholesale quantities. Once the court had resolved the dispute between the parties thereto as to whether or not sales to retailers should be included in calculating the number of sales of the merchandise in the various wholesale quantities in which it was actually sold, it found usual wholesale quantity from the "major portion, or greatest number, of sales or offers for sale in a wholesale quantity * * *." The court did not consider as material, nor as in any way affecting its conclusion, the fact that with respect to one of the types of gauge glasses in issue, described as Perth quality, the total value of the sales which the manufacturer characterized as "wholesale" was 67 per centum of the company's business as against a value of only 28 per centum for the more numerous sales to retailers. Neither a preponderance of total units sold, nor a greater volume of business in money value modified the application of the well-settled major portion of sales rule.

Although in the instant case the plywood sold in less than carload quantities, under 5,000 feet, had a value, and was of a quantity which was almost insignificant when compared with that sold in carload lots, whereas in the *Jenkins* case, *supra*, the value of the sales to retailers of the Perth quality gauge glasses more closely approximated that of the sales to wholesalers, the difference between the two factual situations is one of degree rather than kind. If the volume of business is a factor, tangible or intangible, to be considered in ascertaining usual wholesale quantities, it was as relevant in the *Jenkins* case, *supra*, as it is here. That the court in that case did not deem it so, should certainly govern our actions here.

As noted by the trial court, since the decision in the *Minkus* case, *supra*, the major portion of sales rule has been consistently reaffirmed in the following cases: *Adolph Goldmark & Sons Corp.* v. *United States*, 22 C. C. P. A. (Customs) 358, T. D. 47378; *United States* v. *G. Gennert, Inc.*, 22 C. C. P. A. (Customs) 374, T. D. 47388; *United States* v. *Livingston & Southard, Inc.*, 23 C. C. P. A. (Customs) 214, T. D. 48060; *United States* v. *Rodier, Inc.*, 23 C. C. P. A. (Customs) 336, T. D. 48196; *United States* v. *American Glanzstoff Corp.*, 24 C. C. P. A. (Customs) 35, T. D. 48308; *Lovell Dressel Co., Inc.* v. *United States*, 25 C. C. P. A. (Customs) 64, T. D. 49064; *Jenkins Brothers* v. *United States, supra; United States* v. *Semon Bache & Co.*, 25 C. C. P. A. (Customs) 387, T. D. 49466; *United States* v. *Mexican Products Co.*, 28 C. C. P. A. (Customs) 80, C. A. D. 129; *Semon Bache & Co.* v. *United States*, 28 C. C. P. A. (Customs) 166, C. A. D. 140; *American Shipping Co. (General Electric X-Ray Corp.)* v. *United States*, 29 C. C. P. A. (Customs) 250, C. A. D. 198; and *M. V. Jenkins et al.* v. *United States*, 34 C. C. P. A. (Customs) 33, C. A. D. 341.

In instances where, as in the *Rodier* or *Goldmark* cases, *supra*, there are references to the volume of business, separate and distinct from

the numbers of individual sales, there exists the coincidence that the more frequent sales directly reflected the greater proportion of the business transacted. These expressions must be accepted merely as elements which served to bolster the conclusion reached, rather than as any conscious or deliberate modification of the principle itself.

Counsel for appellee cites the *Gennert* case, *supra*, as authority for the proposition that volume of business is an important factor in determining usual wholesale quantities, because our appellate court held that certain questions asked by the Government concerning the proportion of business transacted in the various categories were erroneously disallowed. It was the court's view there that these questions should have been allowed as "It was essential that a full and impartial investigation of this matter be had, and a failure to permit the introduction of material testimony constitutes error." Its ultimate purpose in remanding the case for the introduction of this line of questioning was to facilitate the ascertainment of the major portion of . sales or offers for sale in wholesale quantities.

However, whether or not there have been any deviations from the general rule, the recent statement by our appellate court in the case of *M. V. Jenkins et al. v. United States, supra,* that "It is well established that the usual wholesale quantity is determined by the greatest number of sales in wholesale quantities" precludes the issue.

We are not authorized to reject a principle which has been so frequently applied and oft repeated as the one here involved even though not to do so may result in the anomalous situation that a very minor portion of a company's total volume of business, a method of doing business which could be, and here was, subsequently eliminated without in any way upsetting the company's economic equilibrium, is thus held to establish the standard for its wholesale transactions as of the date of exportation.

In no event are the preceding comments to be construed as a ratification in whole or in part of the theory of the court below that:

To apply the so-called major portion of sales rule to the facts of this case and hold that the market value or price of merchandise imported in carload quantities was that applicable to sales in quantities of less than a carload and less than 5,000 square feet would artificially raise the market value of the goods for customs revenue purposes above the value of the goods in the actual market for such goods and above the price at which anyone who cared to buy could purchase such goods, and would impose upon the importer a hardship and an unreasonable and unjust tax burden and a higher price upon the American consumer. Such a construction of the statute would deprive the plaintiff herein of its money and property without due process of law in violation of the fifth amendment to the Constitution.

As Congress has the power to impose any measure of the value of imported merchandise which is dutiable upon an ad valorem basis, *Japan Import Co. v. United States,* 24 C. C. P. A. (Customs) 167, T. D. 48642, a judicial construction of the exercise of that power aimed at effectuating the legislative intent may not be said to be a deprivation

of property without due process of law, nor a violation of the fifth amendment to the Constitution of the United States.

By virtue of the uncontroverted fact that during the period, which counsel have agreed is a typical one, sales in less than carload quantities, under 5,000 square feet, far exceeded those in any other quantity bracket, we hold such quantity to be the usual wholesale quantity in which the instant merchandise was freely offered for sale.

Upon the entire record the court finds:

1. That the merchandise involved in this case consists of birch plywood of various grades, thicknesses, and sizes, imported into the United States from Canada, in carload quantities.

2. That at the time of exportation of the instant merchandise such merchandise was freely offered for sale for home consumption in the ordinary course of trade to all purchasers in the principal market of Canada in three wholesale quantities, namely, (a) carload quantities, (b) less than carload quantities but over 5,000 square feet, and (c) less than carload quantities, under 5,000 square feet.

3. That sales in less than carload quantities and less than 5,000 square feet were numerically greater than sales in either of the other quantity categories mentioned in finding 2.

4. That the appraised value for each item represents the less than carload, under 5,000 square feet, quantity.

5. That there was no higher export value at which the merchandise was offered for sale.

We therefore conclude as matters of law:

1. That the usual wholesale quantity for the merchandise at bar is a less than carload quantity, under 5,000 square feet.

2. That foreign value, as that value is defined in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, is the proper basis of value for the merchandise in issue.

3. That such value for each item involved is the appraised value.

The judgment of the court below is reversed. Judgment will issue accordingly.